Receipt No. 62038

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
APR 28 2008
U.S. COURT OF FEDERAL CLAIMS

SDS INTERNATIONAL, INC.
1320 Central Park Boulevard
Suite 300
Fredericksburg, VA. 22401-4954

Plaintiff,

v.

THE UNITED STATES

Defendant.

USCFC No. 08-314 C

**COMPLAINT**
**(Contract Disputes Act)**

**COMES NOW** Plaintiff, SDS International, Inc. ("SDS"), by and through undersigned counsel, hereby files its Complaint against Defendant, the United States, and alleges as follows:

**Jurisdiction**

1. This Court has jurisdiction over this matter under 28 U.S.C. §1491 (a)(1) and 41 U.S.C. §§ 602 & 609(a)(1) & (3) (the "Contract Disputes Act" or the "CDA"). This is a contract action based upon the Contracting Officer's September 30, 2007 final decision regarding SDS's termination for convenience claim submitted under a contract issued by the United States Air Force (the "Air Force"). SDS is bringing this action within twelve months from receipt of the final decision in response to SDS's claim.

## Factual Background

Nature of the Action

2. SDS is bringing this action to recover monies owed as a result of the Air Force's decision to terminate for convenience SDS's performance under a fixed price task order. The Air Force's decision to terminate SDS's performance of the task order was due to a change in the Air Force's requirements. The project at issue required that SDS develop courseware for the Air Force. The parties agreed that SDS would be paid based on a percentage of completion basis rather than per deliverable. Unfortunately, from the beginning, the project was hampered by a lack of objective criteria concerning the suitability of the courseware, and the Air Force's subjective determinations related to acceptable deliverables. The Air Force issued the task order under an Indefinite Delivery/Indefinite Quantity ("ID/IQ") contract that contained the commercial termination for convenience ("T for C") clause specified under FAR clause 52.212-4. The T for C clause obligated the Air Force to pay SDS a percentage of the contract price based upon work completed prior to the termination. SDS completed approximately 40.7 percent of the contract work prior to the termination, and is owed approximately $385,697. SDS can prove both the percentage of completion and the unpaid dollars through the standard records SDS maintained during performance. SDS made every effort to negotiate a reasonable termination settlement. During negotiations, the Air Force never disputed the percentage of work completed. It simply has chosen not to pay a reasonable termination settlement and instead issued a Final Decision thereby forcing litigation.

The Contract at Issue

3. On July 14, 2006, the Air Force awarded SDS an ID/IQ Contract, Contract No. FA3300-06-0018 (the "Contract"). The Contract contained a maximum value of $4.9 million, with a base year performance period (July 15, 2006 - July 14, 2007) and two option years (July 15, 2007 - July 14, 2008 and July 15, 2008 - July 14, 2009).

4. The Contract contained labor rates for an estimated number of hours under seventeen specific labor categories. Under the terms of the Contract, the Air Force anticipated issuing future task orders in support of the Air Force's Institute for Advanced Distributed Learning located at Maxwell AFB.

5. The Contract included a Statement of Objectives ("SOO"). The SOO included conversion of existing courseware into web-based training courseware and the development of new courseware for network-centric learning delivery.

6. The Contract included FAR Clauses 52.212-4 "Contract Terms and Conditions-Commercial Items (Sep 2005)." Under paragraph (l) "Termination for the Government's Convenience," the Government reserved the right to terminate SDS's performance for the convenience of the government.

7. In the event of a T for C, the Air Force was obligated to pay SDS a percentage of the contract price that reflected the percentage of work SDS had performed prior to the notice of termination. The Air Force was also obligated to pay SDS reasonable charges resulting from the termination, as long as SDS could demonstrate those charges based upon SDS's standard record keeping system. The T for C Clause stated:

> (l) *Termination for the Government's convenience*. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

<u>The Task Order at Issue</u>

8. On July 31, 2006, the Air Force issued Task Order No. 0002 (the "Second Task Order"). The Second Task Order was a fixed price task order in the amount of $1.2 million. The Second Task Order contained a ten-month period of performance that ran from July 28, 2006 to May 7, 2007.

9. Prior to issuing the Second Task Order, the Air Force had also issued Task Order No. 0001 under which SDS was to convert and enhance one existing Air Force Air Command and Staff College ("ACSC") resident course into two (2) master degree level network-centric courses. That work was effectively a prototype of the work subsequently required under the Second Task Order

10. Under the terms of the Second Task Order, SDS was to convert and enhance existing ACSC resident courses into nine (9) master degree level network-centric courses for eventual deployment on the Air Force's Blackboard Academic suite course management system. SDS also was required to develop two (2) self-paced

courses to assess both faculty and student readiness for distance learning. Section 2.1 of the SoW listed the nine master's level courses.

11. Section 3.1 of the SoW for the Second Task Order required that SDS work with Air Force subject matter experts ("SMEs") to design, develop and test the nine courses. That section also specified that the courses should emulate the resident ASCS courses.

12. Section 3.2 required that SDS work with ACSC's master's degree working groups to analyze current curriculum, identify areas for improvement and recommend solutions and methods. The solutions were to meet the master's degree level Southern Association of College and Schools ("SACS"), emulate the existing SACS-accredited ACSC curriculum, and comply with the network-centric curriculum/content development and SACS requirements checklist that were contained in Appendices 1 and 2 attached to the Second Task Order.

13. Subsections 3.2.1 through 3.2.11 of the SoW stated a series of specific tasks related to the design and development of the courses. The subsections referenced deliverables such as graphics and interactive modules, scenario/simulation challenge based learning modules, other electronic courseware resources, and also course, lesson and assessment templates. Those subsections did not however specify any acceptability criteria for the courses or any course-related deliverables.

14. Subsection 3.2.12 specified an approval process for the courses and deliverables, and contained specified periods of performance for the deliverables. That

subsection, however, did not specify any acceptability criteria for the courses and deliverables.

15. Section 4.0 of the SoW contained general information related to deliverable acceptance. Subsection 4.1.1 of the SoW specified the criteria for acceptance. That section required that the course documents be developed in Microsoft Word format and run on the Blackboard Academic suite.

16. Section 5.0 of the SoW contained a Service Summary ("SS") and three performance objectives. The Service Summary also contained performance thresholds for each of the three specified performance objectives.

17. The performance objective under SS 1 required that SDS submit monthly progress reports. The performance threshold required that each report record all work performed in a given month, including deliverables completed or partially completed, and also total funds expended to date.

18. The performance objective under SS 2 required that SDS consult with the ASCS master's degree working groups in the design, development and delivery of the nine required courses. The performance threshold for SS 2 reiterated the deliverables specified under subsections 3.2.1 through 3.2.11 of the SoW. The performance objective under SS 3 required that SDS deliver course related deliverables and documents.

19. The performance thresholds for the performance objectives under SS 2 and SS 3 referenced "required course materials" such as learning objectives, outcomes and assessments, activities, interactive modules, supporting technical and student data, and a scenario/simulation.

20. The performance thresholds stated that the Air Force would review the courses and course-related deliverables to assure that they were complete and accurate, and in compliance with SACS requirements for graduate level programs. However, the performance thresholds and the SoW did not specify any objective standards for completion or accuracy that the Air Force would utilize when reviewing and approving the courses and course-related deliverables.

21. Appendix 2 of the SoW contained the SACS requirements checklist (the "Checklist"). The Checklist contained requirements related to Institutional Context, Curriculum and Instruction, Faculty Support, Student Support and Program Evaluation and Assessment. The Checklist, however, did not specify any objective standards for completion or accuracy that the Air Force would utilize when reviewing and approving the courses and course-related deliverables.

22. The SoW did not otherwise specify any acceptance criteria for the courses or the course-related deliverables.

23. Despite the fact that the Second Task Order required a ten-month performance period, it did not specify any procedure for billing for interim work that SDS completed during performance.

<u>SDS Performance of the Second Task Order</u>

24. SDS began performance of the Second Task Order on or about July 31, 2006.

25. On or about August 4, 2006, SDS forwarded an email to the Contracting Officer in which SDS proposed to bill the Air Force for partial payments during the ten

month performance period. Subsequently, the contracting officer requested that SDS utilize a percentage of task completion as a basis for payment.

26. Based upon the contracting officer's request, SDS utilized its Work Breakdown Structure to estimate a percentage of project completion and thereafter utilized a monthly analysis of the percentage of work completed to support SDS's billings.

27. During performance, SDS consistently prepared its invoices on a percentage of completion basis that reflected SDS's progress against the individual tasks specified in the SoW.

28. During performance, SDS consistently submitted the progress reports as required under SS 1. The progress reports reflected the status of the development of the courses and course-related deliverables against the tasks specified under individual subsections under section 3.2 of the SoW, as well as SDS's progress in developing the two new faculty and student readiness courses.

29. At no time during performance did the Air Force ever question the percentages of work referenced in SDS's progress reports. Instead, the Air Force indicated that it was displeased with the quality of the deliverables.

30. The SoW did not contain any objective criteria regarding deliverable quality or completeness, and SDS was constantly dealing with the Air Force's subjective interpretation regarding the acceptability of the courses and course-related deliverables. Even so, SDS made every effort to complete the project.

The Air Force's Suspension of Work and Termination for Convenience

31. On November 22, 2006, the contracting officer issued a Stop Work Order and directed SDS to suspend work on the Second Task Order. Thereafter, the Air Force never directed SDS to resume work on the Second Task Order.

32. By letter dated June 20, 2007, the Air Force terminated SDS's performance of the Second Task Order for the convenience of the government. The Air Force's termination decision was based upon a change in the Air Force's requirements. The Air Force also requested that SDS submit a termination settlement proposal.

Work Completed prior to the Stop Work Order

33. As of the date of the Stop Work Order, SDS had completed approximately 40.7 percent of the work required under the Second Task Order.

34. As of the date of the Stop Work Order SDS had already provided all deliverables that were required prior to the date of the Stop Work Order per the deliverable schedule specified under subsection 3.2.12 of the SoW.

35. Prior to receiving the Stop Work Order, SDS had submitted two invoices (invoice Nos. 5654 and 5880) totaling approximately $375,761. The Air Force only had made partial payments totaling $125,661 on those two invoices.

36. As of the date of the Stop Work Order, SDS was owed approximately $250,100 for work reflected on the two invoices for which the Air Force had only provided partial payment.

37. Prior to the issuance of the Stop Work Order, the contracting officer never disputed the percentage of work completed that SDS had used to calculate the dollar amounts on the two outstanding invoices.

38. As of the date of the Stop Work Order, SDS also was owed approximately $15,910 in interest on the unpaid balance on the two invoices.

39. As of the date of the Stop Work Order, SDS also was owed approximately $119,687 for completed work for which SDS had not yet invoiced.

<u>SDS's Termination Claim Submission of the Underlying Claim</u>

40. By letter dated June 22, 2007, SDS forwarded its termination settlement proposal requesting approximately $422,827.

41. SDS's termination settlement proposal included approximately $385,697, an amount that represented monies owed SDS for work completed on the Second Task Order prior to the Stop Work Order, and the subsequent termination, plus interest on the two outstanding invoices.

42. SDS's termination settlement proposal also included approximately $37,130, an amount that represented monies owed SDS for termination costs and other costs incurred through the date of termination.

<u>Negotiations and the Contracting Officer's Final Decision</u>

43. During July and August 2007, SDS repeatedly attempted to negotiate a good faith settlement with the Air Force. In an effort to reach a settlement, SDS twice reduced its termination settlement proposal. SDS first reduced its settlement offer

from $422,827 to $350,000. SDS subsequently again reduced its offer to $340,000.

44. By letter dated August 29, 2007, SDS also forwarded a progress summary of completion per the specific activities required in the SoW. SDS provided that information in support of its position that it had completed approximately 40.7 percent of the work prior to the Air Force's issuance of the Stop Work notice.

45. At no time during the negotiations did the Air Force ever present any evidence that disputed SDS's position regarding the amount of work completed prior to the Air Force's issuance of the Stop Work notice, and the subsequent termination.

46. On September 30, 2007, the contracting officer issued a Final Decision.

47. Per the Final Decision, the Air Force agreed to pay SDS only $37,130 in termination costs.

48. Per the Final Decision, the Air Force refused to recognize that SDS was owed any additional monies over and above the partial payments it previously had made in response to SDS's two prior invoices.

49. To date, SDS has never been compensated in full for work completed prior to the Stop Work Order or the Air Force's termination of the Second Task Order.

**Count I (Amounts Owed for Work Completed)**

50. The allegations in Paragraphs 1 through 49 above are incorporated by reference and reasserted in Count I herein.

51. The T for C clause obligates the Air Force to reimburse for the percentage of the contract price that reflects the percentage of work SDS had completed prior to the termination.

52. Prior to the termination, SDS completed approximately 40.7 percent of the work required under the Second Task Order.

53. SDS is owed a minimum of $385,697, which represents monies owed SDS for work completed on the Second Task Order prior to the Stop Work Order, and the subsequent termination, plus interest on the two outstanding invoices through the date of the Final Decision.

**WHEREFORE,** SDS respectfully requests that the Court award SDS the following relief:

- Monies owed for work completed prior to the termination totaling at least $385,697; and
- Allowable CDA interest, attorney's fees and other relief that the Court deems appropriate.

Respectfully submitted,

Date: 4/22/08

By:

Christopher M. Johnson,
Centre Law Group, LLC
1953 Gallows Rd, Suite 650
Vienna, VA. 22102
(703) 288-2800
(703) 288-4868 (fax)

Brian C. Caney-Of Counsel

Counsel for Plaintiff
SDS International, Inc.